IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ROBERT ALEXANDER TUFT,                        §
                                              §
        *Plaintiff*,                          §
                                              §
v.                                            §        CIVIL ACTION NO. H-06-2529
                                              §
BRENDA CHANEY, ET AL.,                        §
                                              §
        *Defendants*.                         §

## MEMORANDUM OPINION AND ORDER

Plaintiff, a state inmate proceeding *pro se*, filed this section 1983 lawsuit complaining of violations of his civil rights by Texas Department of Criminal Justice ("TDCJ") employees Doug Dretke, Brenda Chaney, Richard Leal, and Kathren Gonzalez. The Court granted partial summary judgment in favor of defendant prison officials, and ordered defendants to file an amended dispositive motion as to plaintiff's remaining two claims.

Pending before the Court are defendants' amended motion for (final) summary judgment (Docket Entry No. 95) and plaintiff's response in opposition (Docket Entry No. 102). Also pending is defendants' motion to strike affidavits (Docket Entry No. 106), to which plaintiff filed a response (Docket Entry No. 107).

After carefully reviewing the motions and responses, the record, and the applicable law, the Court GRANTS the amended motion for (final) summary judgment, GRANTS in

part and DENIES AS MOOT in part the motion to strike affidavits, and DISMISSES this case for the reasons that follow.

### Background and Claims

On February 17, 2009, the Court dismissed by summary judgment all of plaintiff's claims in this lawsuit except his Fourth Amendment claim regarding a female officer's participation in his 2005 strip search and his challenge to the constitutionality of TDCJ AD 03.22 regarding strip searches.  He seeks declaratory and injunctive relief with recovery of nominal and punitive damages.  Stated succinctly, plaintiff claims that the strip search was unreasonable; that the prison policy governing the strip search is unconstitutionally vague; and that TDCJ should be ordered to rewrite the prison strip search policy.

By defendants' pending amended motion for (final) summary judgment, defendants seek summary judgment dismissing plaintiff's two remaining claims.

### Summary Judgment Standard of Review

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(C).  A factual dispute will preclude a grant of summary judgment if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The trial court may not weigh the evidence or make credibility determinations.  *Id*.  Conclusory

allegations, speculation, improbable inferences, or a mere scintilla of evidence, however, are

insufficient to defeat a summary judgment motion.  *See Michaels v. Avitech, Inc.*, 202 F.3d

746, 754-55 (5th Cir. 2000).  The Supreme Court recognizes that facts must be viewed in the

light most favorable to the nonmoving party at the summary judgment stage only if there is

a genuine dispute as to those facts.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### *Factual Analysis*

Plaintiff complains that, on February 26, 2005, he was strip searched in the presence

of a female prison officer, defendant Kathren Gonzalez, who "participated in a visual cavity

search of Plaintiff with no extraordinary circumstances present."  (Docket Entry No. 21, p.

11.)  Specifically, plaintiff states that he and six other offenders were asked by Gonzalez to

strip, open their mouths, lift their genitals, and expose their anuses [1] in the presence of

Gonzalez and three male officers.  *Id.*  He claims that Gonzalez's participation in the strip

search violated his Fourth Amendment right to be free from unreasonable searches, and  sues

Gonzalez in her individual capacity.

According to plaintiff's pleadings and summary judgment evidence, on February 25,

2005, the day before the strip search, unknown offenders were unlawfully smoking cigarettes

in plaintiff's prison dormitory.  Prison officers discovered the security and safety breach, and

immediately undertook an investigation.  Cells were searched, offenders strip searched, and

---

[1]As plaintiff performed a manual manipulation of his own body as instructed by a prison
officer, and he makes no claim that any officer physically touched him, the body cavity search falls
under the category of a "visual body cavity search."

3

some contraband cigarettes were found.  The investigation continued into the next day, when all of the dorm cells were again searched and offenders questioned and strip searched.  Prior to being called in for strip searches, they were told that "if [they] did not give names and information on who was smoking in the back of [the] dorm, [they] could be expecting to be subject to this type of treatment until [they] cooperate."  (Docket Entry No. 102, Exhibit A.)

Plaintiff and five other offender residents of the dorm were called into the administration office as a group for a strip search.  According to two offender affidavits submitted by plaintiff, the strip search episode unfolded as follows:

> Lt. Gonzales (sic) told us to get out of our clothes.  This is a fairly small office for eleven people to be standing in. [She] went behind a small desk and sat down.  She was only a few feet from us and was looking directly at us.  She told us again to 'get out of 'em.' [Plaintiff] and [another inmate] started to argue with her but she said that if we continued to hold out on who was smoking that we could expect this on a regular basis.  We would 'ride the heat' for the smokers. [Plaintiff] said something about constitutional rights and Abu Ghraibe, but [she] said to get out of them or go to [lock-up].

> Lt. Gonzales (sic) directed us on what to do.  When we got undressed – stripped naked – she was telling us to open our mouths, lift our genitals, turn around and spread our buttock cheeks, and show the bottom of our feet.  She could have reached out and touched us.  I felt coerced into doing what she said and felt I had no choice.

(Docket Entry No. 102, Exhibit B.)

> Lt. Gonzales (sic) was sitting at a desk about four or five feet from me [.] Lt. Gonzalas (sic) was in clear line of sight of all inmates.  The other four inmates were about six to eight feet away on the other side of the small office.  [Two other officers] were conducting the search. Lt. Peterson was providing security and Lt. Gonzalas (sic) did not assist directly in the search of our clothing, but

did assist in the visual cavity search of our rectums and mouths.  She was
looking directly at us and was instructing us on what to do next[.]

*Id*., Exhibit A.  Plaintiff asserts that his Fourth Amendment rights were violated by female

officer Gonzalez's participation in what was a non-emergency strip search.

Defendants disagree with plaintiff's version of the events.  In her own affidavit

submitted in support of the amended summary judgment motion, TDCJ Lieutenant of

Correctional Officers defendant Kathren Gonzalez testified, in relevant part, as follows:

To the best of my recollection, I was alone in the Lieutenant Supervisor's
Office filling out routine paperwork on or about February 26, 2005.  The office
in which I was working is fairly large, possibly 20 by 20 feet or larger.  The
office contains a couple of desks, several filing cabinets and at least two
computer terminals for use by supervisory staff.  Although it usually remains
open, the room has a door that may be closed for privacy if necessary.

My recollection is that I was seated at one of the desks working on one of the
computer terminals when Lt. Levi Peterson unexpectedly came through the
door leading a group of inmates and two correctional officers.  I recall that Lt.
Peterson said something to the offenders or the correctional officers about
being strip-searched and that he ordered the two correctional officers to
conduct strip-searches.  Since I had not ordered the strip-search searches, I
simply continued my paperwork.  My recollection is that Lt. Peterson may
have left the room briefly and returned.  I did  not participate in any way in the
inspection of the offenders' shoes, socks, clothing, or bodies.  I do not recall
speaking to the offenders or even observing them before Lt. Peterson stepped
out of the room or afterward.  It was only after I was served with [plaintiff's]
complaint that I learned the offenders apparently were being strip-searched to
try to locate contraband cigarettes.  I cannot recall any interaction with
[plaintiff], or with any of the offenders for that matter, either during this strip-
search or at any other time.

I understand from [plaintiff's] complaint that he claims I told him and the
other offenders that they could expect to be strip-searched again if they did not
provide me with information about the contraband.  I never made any such

5

comment.  Since I had not ordered the search, I had no reason to say anything at all to any of the offenders, and to the best of my recollection I did not say anything to them.  I was nothing more than a bystander to the strip-search apparently ordered by Lt. Peterson.  But even if I had told this or any other offender that he might be strip-searched again if I were unable to find the contraband I suspected him of possessing, that would have been consistent with my duties and obligations to ensure the safety and security of offenders, staff, and the institution, as well as with TDCJ policy regarding offender searches, AD-03.22.  In fact, based on my experience and training, I would expect to be disciplined or even terminated if I did not continue to search for the suspected contraband until it was found.

[Plaintiff] also claims that I had no probable cause to believe he possessed the information about the contraband.  This assertion is mistaken, since it assumed I ordered a search of [him] on the date in question.  In addition, even if I had ordered a strip-search of this or any other offender, I am not required to have 'probable cause' but only 'reasonable cause' to believe the offender is in possession of contraband.  In addition, it would be fully within my authority as a supervisor to order the strip search of any offender whenever I have reasonable cause – in my opinion – to believe he was in possession of contraband.  Prison inmates are not permitted to decide whether I have probable cause or reasonable cause or any other kind of cause to conduct a search.  My duty is to the facility, the offender housed there and to the men and women who work in the facility to make sure they are as safe as possible in all of the circumstances.

In discussing the strip-search policy, Officer Gonzalez further testified that,

The policy permits female officers to provide security during any strip-search, and the policy also permits female supervisors such as myself not only to order a strip-search, but to actually conduct a strip-search in extraordinary circumstances.  Based on my training and experience, the possibility that one or more inmates is in possession of contraband always amounts to extraordinary circumstances, and when in doubt I will always err on the side of caution.  Although I did not order or participate in the strip search [plaintiff] is complaining about in this lawsuit, I would have been fully within my rights and duties as a supervisor, and as a female supervisor, to order and to conduct the strip-search of any offender I reasonably believed might be in possession of contraband.

6

In conclusion, I wish to state unequivocally that I did not participate in any strip-search of [plaintiff] on or about Feb[ruary] 26, 2005.

(Docket Entry No. 96, Exhibit C.)

In his affidavit submitted in support of summary judgment, Officer Levi Peterson testified in relevant part as follows:

In my almost 25 years' experience with TDCJ, I have conducted many, many strip-searches of prison inmates.  As a supervisor, I have ordered that strip-searches to be (sic) conducted pursuant to agency policy whenever I have had reasonable cause to believe that an offender might be in possession of contraband.

Although I cannot recall every detail of the events in question. my best recollection of the events in this lawsuit is as follows:

I took a group of offenders six or seven (sic) to the supervisor's office at the Jester III unit in February 2005 to undergo a strip search.  I cannot recall at this time specifically why the decision was made to strip-search these offenders, whether I ordered that the strip-search be conducted or if another supervisor ordered it or what contraband was being sought.  I do recall that I led two correctional officers and the small group of offenders to the supervisor's office, which privacy (sic) for strip-searches.  When I entered the room, I found [Officer Gonzalez] working on the computer at one of the two or three desks located in the office.  My best recollection of the layout of that office is that she would have had to have been facing the computer screen or the wall behind it and away from the offenders I'd brought into the office.

I cannot recall what, if anything, I said to [Gonzalez] about the strip-search. There was nothing unusual about [her] being in the supervisor's office and there was nothing unusual about strip-searches in that office or in [Gonzalez's] presence.  TDCJ does not prohibit female officers, who probably are the majority, from being present during strip-searches.  It also wasn't unusual for offenders to be strip-searched, since most of them are strip-searched almost every day as they return to their housing from jobs, from recreation, from school and so on.  In fact, the trusty groundskeepers I supervise are strip-searched several times a day: when they leave the trusty camp to go to work,

7

when they go to chow in the building and when they come back to the trusty camp in the evening. Strip searches are simply a routine part of being a Texas prison inmate, and they are very important to institutional security and safety, since the introduction of contraband – drugs, knives, tobacco, cell phones, etc. – can be very disruptive and sometimes very dangerous to prison security.

I am certain that the strip-search was conducted by the two correctional officers I brought with me to the supervisor's office, and that I never asked [Gonzalez] for any help. I am certain that she did not participate in any way, since her assistance was not requested and not needed. The COs – it may have been Gonzales[2] and Agumagu – would have had the inmates strip down to their shorts while they waited to be searched. Their uniforms, shoes and socks would be checked. Then they would be ordered to show the bottoms of their feet, open their mouths and run their hands across their heads to show there was nothing hidden in their hair. They also would be required to open their mouths to show there was nothing hidden inside. Then the inmates would be ordered to drop their boxers, raise their testicles and turn around and spread the cheeks of their buttocks. The entire process usually takes well under two minutes per offender. The total time they might be fully exposed is a few seconds at most.

If [Gonzalez] saw any of the inmates naked, it was incidental to her being in that office at that time. I do not recall [her] speaking to any of the offenders at any time. I am certain that she could not have ordered the strip searches, since she obviously was working in the supervisor's office before I left for the office with the [officers] and the offenders, and I would not have taken them to be searched unless either I had made a determination that they needed to be searched or I was ordered to do so by another supervisor.

(Docket Entry No. 96, Exhibit E.)

As is apparent, the parties disagree as to whether defendant Gonzalez actually participated in the subject strip search. However, as shown below, this dispute raises no

---

[2]In absence of any clear evidence to the contrary, the Court will assume that plaintiff and his offender witnesses have not confused defendant female officer "Gonzalez" with non-defendant female officer "Gonzales." The Court's granting of summary judgment in the instant case is based on the absence of a Fourth Amendment violation, not misidentification of prison personnel.

genuine issue of material fact precluding summary judgment in this case because, even assuming it was defendant Gonzalez, not non-defendant officer *Gonzales*, who participated in the subject strip search, no Fourth Amendment violation is shown.

### *Eleventh Amendment Immunity*

Defendants move for summary judgment on plaintiff's claims against them in their official capacity on grounds that they are immune from such relief under the Eleventh Amendment.  Plaintiff's claims for monetary damages against all of the defendants in their official capacities as employees of the State of Texas are barred by the Eleventh Amendment, and these claims are dismissed.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002).

However, Eleventh Amendment immunity does not end the inquiry in the instant case. In *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court carved out an exception to Eleventh Amendment immunity.  The Court held that enforcement of an unconstitutional law is not an official act because a state can not confer authority on its officers to violate the Constitution or federal law.  *See American Bank & Trust Co. of Opelousas v. Dent*, 982 F.2d 917, 920-21 (5th Cir. 1993).  To meet the *Young* exception, plaintiff here must allege a violation of federal law against individual persons in their official capacities as agents of the state, and seek declaratory or injunctive relief that is prospective in nature and effect.  *See Aguilar v. Tex. Dep't of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998); *see also Mayfield v. Tex. Dep't of Criminal Justice*, 529 F.3d 599, 604-05 (5th Cir. 2008).

Accordingly, plaintiff's claims against defendants for declarative and injunctive relief are not barred under the Eleventh Amendment.

### Vicarious Liability

It is well established that section 1983 does not create vicarious or *respondeat superior* liability.  *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Evett v. DETNTFF*, 330 F.3d 681, 689 (5th Cir. 2003).  Plaintiff's claims against defendants Dretke, Chaney, and Leal for vicarious or *respondeat superior* liability are dismissed for failure to state a claim.  As plaintiff also fails to establish any factual basis for personal involvement on the part of these defendants regarding the subject strip search, his claims against them in their individual capacity are dismissed.  *See Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) (holding that personal involvement is an essential element of a claim brought pursuant to section 1983).

### Qualified Immunity

One or more of the defendants claim entitlement to qualified immunity against plaintiff's claims for monetary damages in this case.

Plaintiff acknowledges that he is not seeking monetary damages in this lawsuit. (Docket Entry No. 102, p. 15.) Accordingly, the issue of qualified immunity need not be addressed. Plaintiff's entitlement to declaratory and injunctive relief, however, remains extant and is addressed below.  *See Hutchins v. McDaniels*, 512 F.3d 193 (5th Cir. 2007).

*Claim for Declaratory Relief*

Plaintiff claims that the 2005 strip search was unreasonable and violated his Fourth Amendment protections.[3]  An offender may recover nominal and punitive damages, despite lack of a physical injury, if he can successfully prove that prison officials violated his Fourth Amendment rights.  *Hutchins v. McDaniels*, 512 F.3d 193, 198 (5th Cir. 2007).

A state offender's Fourth Amendment protections are greatly limited in context of prison situations.  "A prisoner's rights are diminished by the needs and exigencies of the institution in which he is incarcerated.  He thus loses those rights that are necessarily sacrificed to legitimate penological needs." *Moore v. Carwell*, 168 F.3d. 234, 236-37 (5th Cir. 1999) (citations omitted).  However, the Fourth Amendment protects prisoners from searches and seizures that go beyond legitimate penological interests.  *Id.*  Searches of offenders must be conducted in a manner that is reasonable under the facts and circumstances in which they are performed.  *Id.* at 237.  As recognized by the Supreme Court,

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.  In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Bell v. Wolfish*, 441 U.S. 520, 559 (1979); *Moore*, 168 F.3d at 237.

---

[3]Plaintiff's ancillary issue – that his strip search violated the administrative directive – need not be addressed, as the violation of a prison policy, standing alone, does not give rise to a federal constitutional issue.  *See Samford v. Dretke*, 562 F.3d 674, 681 (5th Cir. 2009).

The burden of proving reasonableness in the instant case, however, is a light burden because an administrator's decisions and actions in the prison or jail context are entitled to great deference. *Elliott v. Lynn*, 38 F.3d 188, 191 (5th Cir. 1994).  With respect to any potential Fourth Amendment claim, offenders do not have a right to be free from strip searches, which can be conducted by prison officials without probable cause provided that the search is conducted in a reasonable manner. *Bell v. Wolfish*, 441 U.S. 520, 558-59 (1979).

The Fifth Circuit has ruled that a male inmate being strip searched by a female officer when a male officer is unavailable does not violate the inmate's constitutional rights, as it relates to a legitimate penological interest in safety and security. *Oliver v. Scott*, 276 F.3d 736, 745 (5th Cir. 2002).  The Fifth Circuit also recognizes that strip searches of a male offender in the presence of a female officer does not raise a constitutional issue. *Letcher v. Turner*, 968 F.2d 508, 510 (5th Cir. 1992).  However, the Fifth Circuit noted in *Moore* that strip and body cavity searches of male offenders, carried out in *non-emergency* situations by female officers when male officers are available, can give rise to Fourth Amendment concerns.  168 F.3d at 235-37.  Thus, according to this Fifth Circuit precedent, a strip and visual body cavity search of plaintiff by a female officer without exigent circumstances and with the availability of male officers *could*, but not necessarily does, constitute an unreasonable search under the Fourth Amendment.

Although the probative evidence submitted by the parties raises a fact issue as to whether defendant Gonzalez actually participated in plaintiff's strip and visual body cavity search, plaintiff presents no probative summary judgment evidence that the search by a female officer was performed under non-emergency circumstances.  Defendants, to the contrary, have submitted probative summary judgment establishing that the factual circumstances asserted by plaintiff constitute "extraordinary circumstances."[4]  As testified by defendant Officer Gonzalez,

> I was nothing more than a bystander to the strip-search apparently ordered by Lt. Peterson.  But even if I had told this or any other offender that he might be strip-searched again if I were unable to find the contraband I suspected him of possessing, that would have been consistent with my duties and obligations to ensure the safety and security of offenders, staff, and the institution, as well as with TDCJ policy regarding offender searches, AD-03.22.  In fact, based on my experience and training, I would expect to be disciplined or even terminated if I did not continue to search for the suspected contraband until it was found.

> \*     \*     \*     \*

> The policy permits female officers to provide security during any strip-search, and the policy also permits female supervisors such as myself not only to order a strip-search, but to actually conduct a strip-search in extraordinary circumstances. *Based on my training and experience, the possibility that one or more inmates is in possession of contraband always amounts to extraordinary circumstances*, and when in doubt I will always err on the side of caution.  Although I did not order or participate in the strip search [plaintiff] is complaining about in this lawsuit, I would have been fully within my rights and duties as a supervisor, and as a female supervisor, to order and to conduct

---

[4]This Court does not read *Moore* to preclude "non-extraordinary circumstances" as a functional equivalent of "non-emergency" situations for purposes of Fourth Amendment claims regarding cross-gender strip-searches.

the strip-search of any offender I reasonably believed might be in possession
of contraband.

(Docket Entry No. 96, Exhibit C, emphasis added.)

Further, Brenda Chaney, senior warden at the Jester III Unit, testified in her affidavit

that,

[B]ased on my 22 years of experience and training, the possible presence of
contraband would always present circumstances justifying the strip-search of
offenders believed to be in possession of such contraband.

(Docket Entry No. 96, Affidavit of Brenda Chaney.)

Plaintiff himself states that the basis for his strip-search was prison officials' efforts

to locate the known contraband cigarettes and identify the offenders involved in the security

and safety breach.  In other words, plaintiff does not controvert that the complained-of strip

search was directly related to a particular prison security and safety breach.  Plaintiff's

specific dispute lies with his disagreement that the contraband issue constituted extraordinary

circumstances justifying his search by a female officer when male officers were available.

However, plaintiff is a prisoner; his conclusory allegations and opinions of what constitutes,

or does not constitute, non-extraordinary or non-emergency circumstances regarding prison

security and safety do not rise to the level of probative summary judgment.  Nor does

plaintiff's self-proclaimed extensive base of experience as a "career prisoner" afford him any

special expertise regarding this issue.  To the contrary, this Court must afford great deference

to the prison officials' determinations and opinions that the factual circumstances asserted

by plaintiff constituted extraordinary circumstances. *See Elliott v. Lynn*, 38 F.3d 188, 191 (5th Cir. 1994). Thus, a prison official's opinion that unidentified prisoners smoking contraband cigarettes in the prison dorm would constitute extraordinary circumstances, does stand as probative evidence of such for this Court. Accordingly, Plaintiff fails to meet his burden of proving that his strip search was carried out under non-emergency or non-extraordinary circumstances by a female officer when a male officer was available.

Consequently, even assuming defendant Gonzalez participated in the subject search, no Fourth Amendment violation is shown. Defendants are entitled to summary judgment dismissing plaintiff's Fourth Amendment claim.

### Constitutional Challenge to AD 03.22

Plaintiff prefaces his arguments by stating that he does not "contest the legitimacy of [TDCJ's] interest in security matters such as keeping various types of contraband out of the prisons. Nor does [he] even contest the need for strip-searches in special extreme and/or extraordinary circumstances." (Docket Entry No. 102, p. 16.) Plaintiff does, however, specifically argue that the prison regulation regarding cross-gender strip searches is unconstitutional because the conditions under which such searches may be performed – *i.e.*, under "extraordinary circumstances" – are unduly vague. *Id*., p. 19.

In his response to the motion for summary judgment, plaintiff directs the Court's attention to a list of multi-state authorities, purportedly setting forth cases holding as unconstitutional prison strip-search policies similar to AD-03.22. (Docket Entry No. 102,

15

p. 25)  These cases afford him no legal support, as in none of these cases was a prison strip-search policy such as AD-03.22 found unconstitutional, nor did any of these dozen or so cases involve the "extraordinary circumstances" language challenged here by plaintiff.

The parties agree that the applicable prison regulation regarding inmate strip searches appears in Administrative Directive (AD) 03.22, which provides as follows:

II.     Strip Searches

At times it may be necessary to strip search offenders to ensure the safety of offenders and staff and to detect the presence of contraband. Strip-searches are to be used only when directed by specific unit/facility post orders, or unit/facility departmental policy or when a supervisor believes there is reasonable cause to warrant such a search.  The search shall be performed in a professional manner.  Staff of the same gender shall conduct the search.  Gender specific requirements are as follows:

A.     Female offenders shall not be strip-searched by, or in the visual presence of, male officers.

B.     *For male offenders, if circumstances dictate that the search must be conducted by staff of the opposite gender, such searches are authorized under this policy only in extraordinary circumstances and when approved by a supervisor.*  If, under *ordinary* circumstances, a female officer is present in the vicinity of a male offender being strip-searched, the officer's duty is solely to provide security for the searching officer.  The female officer shall not actively participate in the strip-search. (Emphasis added.)

In evaluating prison regulations that allegedly infringe on inmates' constitutional rights, the Supreme Court holds that a regulation is valid if it is reasonably related to legitimate penological interests.  *Turner v. Safely*, 482 U.S. 78, 89 (1987).  Defendants have

16

presented probative summary judgment evidence that AD 03.22 is reasonably related to legitimate penological interests.  In her affidavit submitted in support of the summary judgment motion, Brenda Chaney, senior warden at the Jester III Unit, testified in relevant part as follows:

> Because this lawsuit centers on strip-searches, it is important to note that the purpose of strip-searches in prisons is to ascertain the presence of contraband on prisoners['] bodies so as to diminish as much as possible security issues that invariably arise when contraband is introduced into prison units.  While it is routine for offenders to hide contraband in virtually any imaginable space accessible to them and within their personal living space, prisoners also frequently hide all kinds of contraband – homemade knives, razors and weapons of all kinds; narcotics; alcohol; gambling slips; tobacco; pornography; cell phones; SIM cards, money, and a wide variety of other prohibited items – under their clothing, in their mouths and hidden elsewhere on their bodies.

> \*   \*   \*   \*

> Because this case involves a strip-search conducted in connection with the suspected possession of cigarettes, I would also note that cigarettes have been prohibited in TDCJ units since at least the mid-1990s.  Because the possession of money by Texas offenders is strictly prohibited, contraband cigarettes and tobacco products are an easily transported, easily concealed and easily traded cash equivalent used by inmates to buy narcotics, marijuana, alcohol, sexual favors, to obtain extra food and personal items, to secure physical protection and to settle wagers, among other things. . . . The black-market prison trade in tobacco is often controlled by prison gangs who employ inmates with access to the areas around prisons to smuggle cigarettes into prison units, and who pay corrupt correctional officers to smuggle contraband into prison units or to look the other way when inmates smuggle in contraband.  Prison gangs also enforce the settlement of tobacco-related debts through other inmates involved in their smuggling enterprises, often with violence.

> In my experience, it is not uncommon for contraband, including tobacco products and cigarettes, to be found at the center of many offender disputes

17

and fights.  I am aware of instances in which inmates have been seriously beaten over cigarettes, over tobacco products or over debts related to tobacco products or debts payable in tobacco products.  As such, my primary responsibilities in providing security and safety for offenders and staff is to ensure that tobacco products are found and confiscated wherever they are suspected top exist, to learn how the contraband made its way onto the prison unit and to do whatever I can to stop the flow of illegal tobacco products into my unit.

To help curb the introduction and circulation of contraband items in prison units, including cigarettes and other tobacco products, TDCJ has adopted an administrative directive, AD-3.22, which covers offender searches.  It provides three levels of searches: (1) a visual and pat-down search, (2) a strip search and (3) a body-cavity search.

The administrative directive provides that if a strip search must be conducted by a staff member of the opposite sex, it may only be conducted in (1) extraordinary circumstances and (2) when approved by a supervisor.  All of my supervisors, male or female, are authorized to approve and to actually conduct strip searches when extraordinary circumstances exist.

The policy does not expressly define what constitutes 'extraordinary circumstances,' but based on my experience and training, the reported introduction of contraband into a prison unit – including but not limited to cigarettes and other tobacco products – can amount to extraordinary circumstances sufficient to conduct a non-routine strip search.

*    *    *    *

With regard to this particular strip-search, I was unaware it had occurred until I learned of the complaint in this lawsuit.  I would not normally be advised of a strip-search for contraband as described in the Plaintiff's complaint.  If a female supervisor ordered and conducted a strip-search, it would not violate TDCJ policy as described above so long as extraordinary circumstances were present.  Nor would policy be violated if a female officer or supervisor were simply present in the room where a strip-search was being conducted.  (Indeed, to exclude a female correctional officer or supervisor from an area in which a strip-search is being conducted would constitute a violation of agency EEO policy.)  In addition, the strip search of six or seven offenders, as alleged by

> Plaintiff, of approximately 110 inmates housed in the 11 and 12 dorms would not be an extraordinarily large number and strongly suggests that the investigation was focused on those offenders most likely to have been in possession of contraband.  The strip-search of offenders in the supervisor's office, which provides some measure of privacy, would also be appropriate.  As noted above, based on my 22 years of experience and training, the possible presence of contraband would always present circumstances justifying the strip-search of offenders believed to be in possession of such contraband.

(Docket Entry No. 96, Affidavit of Brenda Chaney.)

Plaintiff does not controvert the legitimate penological interests supporting AD 03.22; rather, he asserts that, because the term "extraordinary circumstances" is not defined, the written policy is unconstitutionally vague.  (Docket Entry No. 102, p. 19.)

The provisions of AD 03.22 draw a distinction between cross-gender searches in "ordinary circumstances" and "extraordinary circumstances," and only in the latter instance may a female officer strip search a male offender and only then with supervisory approval. In *Oliver v. Scott*, 276 F.3d 736 (5th Cir. 2002), the Fifth Circuit found that the strip-search policy "narrowly cabins the scope of cross-gender strip searches and delegates the decision to the warden," and concluded that the regulation was reasonably related to legitimate penological objectives.[5]  *Id*. at 743.  Thus, the regulation delegates the decision to the prison warden to determine whether or not a particular situation involves "extraordinary

---

[5] The *Oliver* Court held as constitutional the previous version of AD-03.22, which vested the unit warden with authority to order strip-searches.  The current version, at issue here, permits a supervisor to authorize the strip-search.

19

circumstances," a regulatory scheme which the Fifth Circuit found constitutional pursuant to *Turner*.

Plaintiff provides the Court with no relevant legal authority supporting his claim that AD 03.22 is unconstitutionally vague. "Because legalistic wrangling over the meaning of prison rules may visibly undermine the [prison] administration's position of total authority, federal courts have deferred to the interpretation of those rules by prison authorities 'unless fair notice was clearly lacking." *Adams v. Gunnell*, 729 F.3d 362, 369 (5th Cir. 1984) (internal citations and quotations omitted). Accordingly, this Court finds that plaintiff fails to demonstrate that AD 03.22 is unconstitutionally vague in its failure to definite "extraordinary circumstances."

The strip search regulation before this Court provides the flexibility necessary for prison officials to investigate security and safety breaches and to determine, in their discretion, that "extraordinary circumstances" exist. It further affords a significant degree of protection to the Fourth Amendment rights of male offenders regarding strip searches and visual body cavity searches by female officers outside of extraordinary circumstances. The Court declines to accept plaintiff's argument that a "bright line" definition of "extraordinary circumstances" must be implemented in order to render the regulation constitutional. Further, and for the same reasons set forth by this Court for denying plaintiff's Fourth Amendment claim, the regulation was not unconstitutional as applied to plaintiff. Defendants are entitled to summary judgment dismissing plaintiff's claims on this issue.

*Claim for Injunctive Relief*

Plaintiff requests prospective permanent injunctive relief ordering TDCJ to revise AD 03.22 in a manner similar to California state law; *i.e.*, that all prisoner searches "be conducted in a professional manner which avoids embarrassment to the prisoner.  Whenever possible, unclothed body inspections of prisoners shall be conducted outside the view of others."  This Court notes that the analogous TDCJ policy, AD 03.22, already provides that strip-searches "shall be performed in a professional manner.  Staff of the same gender shall conduct the search."  Petitioner ignores the additional California state law that states that, "Correctional employees, other than qualified medical staff, shall not conduct unclothed body inspections of inmates of the opposite sex *except under emergency conditions with life or death consequences*."  CAL. ADMIN. CODE tit. 15, § 3287 (emphasis added).  As with the Texas provision regarding "extraordinary circumstances," this California provision does not define "emergency conditions with life or death consequences."

As stated previously, defendants are not entitled to dismissal of this claim based on qualified immunity, as qualified immunity does not protect them from requests for injunctive relief.  *See Williams v. Ballard*, 466 F.3d 330, 334 (5th Cir. 2006); *Orellana v. Kyle*, 65 F.3d 29, 33 (5th Cir. 1995).  Accordingly, the Court must consider whether defendants are entitled to summary judgment dismissing plaintiff's request for injunctive relief.

To prevail on his claim, plaintiff must prove a deprivation of his constitutional rights pursuant to an official state policy in order to obtain injunctive relief from the state or state

employees acting in their official capacity.  *See Kentucky v. Graham*, 473 U.S. 159, 165-67 (1985); *Grandstaff v. City of Borger*, 767 F.2d 161, 169 (5th Cir. 1985).  Here, the Court has already determined that plaintiff failed to prove a violation of his Fourth Amendment rights. Thus, he is not entitled to prospective injunctive relief in this case.

### *Motion to Strike Affidavits*

Plaintiff attached affidavits of three offenders – Paul D. Durham, Thomas McAlister, and Eugene Ray Cezeaux – to a supplemental response to the amended motion for summary judgment.  (Docket Entry No. 104.)  Defendants move to strike these affidavits because the offender affiants were not present at the strip search made the basis of this lawsuit, and because their affidavits set forth conclusory allegations, personal opinions, and improper purported expert witness opinion.  (Docket Entry No. 106.)

The Court agrees that these affiants' recollections of events occurring after the incident made the basis of this lawsuit have no relevance to the pending motion for summary judgment.  The Court further agrees that the affidavits contain improper and inadmissible conclusory allegations, conjecture, and personal or legal opinions.

None of the offender affiants has sufficient knowledge, skill, experience, training, or education to qualify as an expert in prison security or policy under Federal Rules of Evidence Rule 702.  Their opinions and conjecture regarding the need for certain security measures or the propriety of inmate strip searches are patently inadmissible, and these portions of their affidavits are ORDERED STRICKEN.  The Court will not strike those portions of the

affidavits which set forth the personal experiences of the affiants, but the Court notes that their testimony presents no useful factual allegations, provides no probative summary judgment evidence giving rise to a genuine issue of material fact in this case, and forms no basis for this Court's dispositive ruling in the instant case. *See Akin v. Q-L Investments, Inc.*, 959 F.2d 521, 531 (5th Cir. 1992) ("On a motion for summary judgment the district court should disregard only those portions of an affidavit that are inadequate and consider the rest.").

Accordingly, the motion to strike the affidavits (Docket Entry No. 106) is GRANTED IN PART and DENIED AS MOOT in part.

### Conclusion

The amended motion for (final) summary judgment (Docket Entry No. 95) is GRANTED and this lawsuit is DISMISSED WITH PREJUDICE.  The motion to strike affidavits (Docket Entry No. 106) is DENIED AS MOOT.  Any and all other pending motions are DENIED AS MOOT.

The Clerk will provide copies of this order to the parties.

Signed at Houston, Texas, on January 29, 2010.

_____
Gray H. Miller
United States District Judge