IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ROBERT ALEXANDER TUFT,                 §
                                       §
          *Plaintiff*,                 §
                                       §
v.                                     §          CIVIL ACTION NO. H-06-2529
                                       §
KATHREN GONZALEZ,                      §
                                       §
          *Defendant*.                 §

## MEMORANDUM OPINION AND ORDER

Pending before the Court is the post-remand motion for summary judgment filed by defendant Kathren Gonzalez (Docket Entry No. 121), to which plaintiff has filed a response (Docket Entry No. 130).

Having carefully reviewed the motion and response, the record, and the applicable law, the Court GRANTS the motion for summary judgment and DISMISSES this case for the reasons that follow.

### Background and Claims

#### Prior Proceedings

Plaintiff, a state inmate proceeding *pro se*, filed a section 1983 lawsuit against the State of Texas, the Texas Department of Criminal Justice (TDCJ), and numerous prison officials in their official and individual capacities, seeking nominal, compensatory, and punitive damages, declaratory and injunctive relief, and transfer to federal protective custody. Plaintiff alleged that a variety of prison conditions and two strip searches violated his Eighth

and Fourteenth Amendment protections and the Americans with Disabilities Act.  Plaintiff also challenged the constitutionality of a prison policy regarding cross-sex strip searches. The Court granted summary judgment dismissing all of plaintiff's claims.  Plaintiff appealed.

On appeal, the Fifth Circuit Court of Appeals affirmed the Court's dismissal of plaintiff's claims, except as to plaintiff's claim for an unconstitutional cross-sex strip search allegedly performed in 2005 by, or with participation of, female officer Kathren Gonzalez. *See Tuft v. Chaney*, C.A. No. 10-20136 (5th Cir. 2011).  The Fifth Circuit issued a partial remand for further proceedings regarding plaintiff's claim for nominal and punitive damages against Gonzalez in her individual capacity regarding the cross-sex strip search.  The Fifth Circuit opined that, "on remand, the district court may wish to consider whether [Gonzalez is] entitled to qualified immunity from Tuft's claim for nominal and punitive damages." *Id*., at *10.

This Court ordered Gonzalez to file a post-remand motion for summary judgment addressing the issue of her entitlement to qualified immunity.  The Court advised Gonzalez that, should she determine that a motion for summary judgment would be inappropriate, she was to notify the Court.  Gonzalez subsequently filed the pending motion for summary judgment, seeking qualified immunity as to plaintiff's claim against her.  (Docket Entry No. 121.)  Plaintiff responded, arguing that qualified immunity is unwarranted under the facts of the case.  (Docket Entry No. 130.)

*Current Proceedings*

Plaintiff alleges that his Eighth and Fourteenth Amendment rights were violated on February 26, 2005, when Gonzalez participated in a strip search of plaintiff.  According to plaintiff, he and six other inmates were ordered into a prison security office after being questioned about the source of cigarette smoke that had been detected by prison officials the day before.  Gonzalez was sitting at a desk "within arms reach" of the seven inmates; also present were a male officer named Lieutenant Peterson[1] and two other male officers.  Gonzalez allegedly ordered the inmates to remove their clothing, and two of the officers searched the inmates' clothing while Gonzalez "was directing the search and participated in the visual cavity search by observing closely."  *Tuft*, at *7.  The inmates told Gonzalez that they had no information regarding the cigarette smoke; she allegedly responded that they would be "subjected to these humiliating strip searches by her if [they] did not snitch on the smokers."  *Id*.  No claim is made by plaintiff that Gonzalez performed subsequent strip searches on him.

In the first summary judgment proceeding, Gonzalez and plaintiff disputed whether Gonzalez had participated in the strip search, and both parties presented probative summary

---

[1]Plaintiff did not name Peterson as a defendant.  Plaintiff incorrectly argues that he effectively "amended" his complaint to add Peterson as a defendant by requesting discovery as to Peterson and by mentioning him in his response to the first motion for summary judgment.  Plaintiff further incorrectly argues that the Fifth Circuit was authorized to "embrace" Peterson as a defendant.  Nevertheless, even assuming Peterson were a defendant properly before the Court based on his alleged participation in the 2005 strip search, Peterson is a male officer; his participation did not give rise to a "cross sex" strip search.

judgment supporting their respective positions.[2]  The Fifth Circuit found that plaintiff raised a colorable claim regarding the unconstitutionality of the 2005 strip search and supported it with competent summary judgment evidence, including evidence of Gonzalez's alleged participation.  *Tuft*, at *9–10.  Gonzalez argues in the instant proceeding that, even assuming she participated in the 2005 strip search as alleged by plaintiff, she would be entitled to qualified immunity under the facts alleged by plaintiff.

A copy of the relevant TDCJ policy, Administrative Directive 03.22 (AD 03.22), is attached to the pending motion for summary judgment.  (Docket Entry No. 121, Exhibit 2.) AD 03.22 authorizes strip searches of male offenders by female staff "only in extraordinary circumstances and when approved by a supervisor."  *Id*.  The policy further provides that if, "under ordinary circumstances, a female officer is present in the vicinity of a male offender being strip-searched, the officer's duty is solely to provide security for the searching officer," and that the "female officer shall not actively participate in the strip search."  *Id*.

Plaintiff claims that his strip search by Gonzalez was not in compliance with AD 03.22 and violated his constitutional rights.[3]  He seeks nominal and punitive damages against

---

[2]Plaintiff incorrectly contends that Gonzalez now admits that she participated in the strip search.  (Docket Entry No. 130, p. 10.)  Gonzalez has made no such admission.  Nor are there any inconsistencies between Gonzalez's affidavit in the original motion for summary judgment and her affidavit in the instant proceeding; they are the same affidavit.  (Docket Entry No. 96, Exhibit C; Docket Entry No. 121, Exhibit 3.)  The statements made by Gonzalez in her motion (Docket Entry No. 121, p. 7) were taken directly from the Fifth Circuit's opinion, which paraphrased plaintiff's own allegations.  *Tuft*, at *6–7.

[3]Plaintiff re-urges his challenge the constitutionality of AD 03.22; however, the Fifth Circuit affirmed this Court's dismissal of the claim, and the claim will not be revisited here on remand.

4

Gonzalez in her individual capacity.  Gonzalez contends that, even assuming plaintiff's factual allegations were true, she would be entitled to qualified immunity.

### Standard of Review and Applicable Law

#### Summary Judgment

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(C).  A factual dispute will preclude a grant of summary judgment if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The trial court may not weigh the evidence or make credibility determinations.  *Id.*  Conclusory allegations, speculation, improbable inferences, or a mere scintilla of evidence, however, are insufficient to defeat a summary judgment motion.  *See Michaels v. Avitech, Inc.*, 202 F.3d 746, 754–55 (5th Cir. 2000).  The Supreme Court recognizes that facts must be viewed in the light most favorable to the nonmoving party at the summary judgment stage only if there is a genuine dispute as to those facts.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

---

*Tuft*, at *8 (holding that a prisoner might claim unconstitutional application of AD 03.22, but that AD 03.22  itself is constitutional).

5

*Inmate Strip Searches*

The Fifth Circuit set forth the controlling law in its *Tuft* opinion, which will be restated here.  An inmate possesses a constitutional right to bodily privacy that is minimal, at best, *Oliver v. Scott*, 276 F.3d 736, 745 (5th Cir. 2002), and he "loses those rights that are necessarily sacrificed to legitimate penological needs." *Elliott v. Lynn*, 38 F.3d 188, 190–91 (5th Cir. 1994); *see also Tuft*, at *7–8.  Searches and seizures conducted on inmates "must be reasonable under all the facts and circumstances in which they are performed," but proving reasonableness "is a light burden" because "a prison administrator's decision and actions in the prison context are entitled to great deference from the courts." *Id*.  Visual body cavity searches of inmates can be constitutionally reasonable, but judging the reasonableness of such a search "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails" while "consider[ing] the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id*.; *see also Bell v. Wolfish*, 441 U.S. 520, 558–59 (1979).

In *Moore v. Carwell*, 168 F.3d 234, 237 (5th Cir. 1999), the Fifth Circuit noted that it was possible that the strip search of a male inmate by a female officer, in the absence of an emergency or extraordinary circumstances, could constitute a viable Fourth Amendment claim.  However, the Court stated that, "A prisoner's rights are diminished by the needs and

exigencies of the institution in which he is incarcerated.  He thus loses those rights that are

necessarily sacrificed to legitimate penological needs."  *Id*. at 236–237.

As noted by the Fifth Circuit, plaintiff asserts his claim against Gonzalez under the

Eighth Amendment.  *Tuft*, at *2.  In *Moore v. Carwell*, 168 F.3d 234, 237 (5th Cir. 1999),

the Fifth Circuit affirmed the dismissal of an inmate's section 1983 Eighth Amendment

challenge to a strip search, stating that such claims are governed by the Fourth Amendment,

not the Eighth Amendment.  This distinction was recently reaffirmed in the Fifth Circuit's

unpublished opinion, *Waddleton v. Jackson*, 445 F. App'x 808, 808 (5th Cir. 2011), wherein

the Fifth Circuit stated,

> [The inmate's] allegations regarding the search of his person did not state a
> claim for relief under the Eighth Amendment.  *See Moore v. Carwell*, 168 F.3d
> 234, 237 (5th Cir. 1999).  In this circuit, such claims are properly considered
> under the Fourth Amendment.  *Id*.  [Plaintiff] has not alleged sufficient facts
> to show that the search orders or the searches themselves imposed hardships
> atypical of ordinary prison life.  Nor has he pointed to any specific prison
> regulation allowing unannounced searches that would constitute punishment.
> Thus, no due process protections were triggered here.  *See Sandin v. Conner*,
> 515 U.S. 472, 483–86 (1995); *Bell v. Wolfish*, 441 U.S. 520, 560–61 (1979).

445 F. App'x at 808.  The Fifth Circuit affirmed the dismissal of the inmate's Eighth

Amendment claims as frivolous and for failure to state a claim.

Nevertheless, because the Fifth Circuit found in the instant case that plaintiff "stated

a colorable claim for an unconstitutional cross-sex strip search in 2005" and remanded the

issue to this Court, the Court will consider plaintiff's colorable Eighth Amendment claim

7

under the standards set forth above by the Fifth Circuit, in context of Gonzalez's entitlement to qualified immunity.

*Qualified Immunity*

The defense of qualified immunity protects government officials performing discretionary functions from "liability for civil damages insofar as their conduct does not violate clearly established rights which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Lytle v. Bexar County*, 560 F.3d 404, 409 (5th Cir. 2009).   Government employees are presumptively entitled to the defense of qualified immunity.

A qualified immunity defense alters the usual summary judgment burden of proof. *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005).   Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law.   *Id*.   "Although [qualified immunity is] nominally an affirmative defense, the plaintiff has the burden to negate the defense once properly raised." *Brumfield v. Hollins*, 551 F.3d 322, 326–27 (5th Cir. 2008); *Pierce v. Smith*, 117 F.3d 866, 872 (5th Cir. 1997) (holding that an official need not demonstrate that he did not violate clearly established federal rights, as that burden rests upon plaintiff).   The plaintiff's burden of negating a defendant's qualified immunity defense is a heavy one.   *See*, *e.g.*, *Brown v. Lyford*, 243 F.3d 185, 190, n. 7 (5th Cir. 2001) (stating that a plaintiff must clear a significant hurdle to defeat

8

qualified immunity).  Abrogation of qualified immunity is an exception, not the rule.  *Foster v. City of Lake Jackson*, 28 F.3d 425, 428 (5th Cir. 1994).

A two-step process has traditionally been employed in evaluating the defense of qualified immunity.  *Saucier v. Katz*, 533 U.S. 194 (2001).  Under this approach, a court must first consider whether "the facts alleged show the officer's conduct violated a constitutional right."  *Id*. at 201.  If so, the court then considers whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question.  *Short v. West*, 662 F.3d 320, 325 (5th Cir. 2011).  "To make this determination, the court applies an objective standard based on the viewpoint of a reasonable official in light of the information then available to the defendant and the law that was clearly established at the time of the defendant's actions."  *Id.*  To be clearly established for purposes of qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008).  The unlawfulness of the defendant's actions must have been readily apparent from sufficiently similar situations, but it is not necessary that the defendant's exact acts have been unconstitutional.  *Id*. at 236–37.  Even law enforcement officials who reasonably but mistakenly commit a constitutional violation are entitled to qualified immunity.  *Glenn v. City of Tyler*, 242 F.3d 307, 312–313 (5th Cir. 2001).  "The touchstone of this inquiry is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him

and the clearly established law." *Id.*  In short, a plaintiff must allege facts sufficient to demonstrate that no reasonable officer could have believed his actions were proper.  *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994).

A case may be dismissed, or summary judgment granted, based on either step in the qualified immunity analysis, and the courts may decide "which of the two prongs of the qualified immunity analysis should be addressed first in the light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The Court is of the opinion that the issue of qualified immunity in this case should focus on the second step in the qualified immunity analysis; that is, whether Gonzalez's actions were objectively unreasonable in light of clearly established law at the time of the incident on February 26, 2005.  *See Short*, 662 F.3d at 325.

Plaintiff contends that Gonzalez participated in the cross-gender strip search in order to "sexually coerce" him into telling the officers who was smoking.  He does not allege that Gonzalez herself expressed that as her purpose; to the contrary, plaintiff and his fellow-inmates through their affidavit testimony assert only that they *felt* sexually coerced by the strip search.  Gonzalez denies having participated in the strip search, but states that, even assuming had she acted as alleged by plaintiff, she would be entitled to qualified immunity. Gonzalez argues that prison policy permits the presence and participation of female correctional officers when offenders are strip searched, and other female officers in her position might have concluded that their presence and participation was necessary and did

not violate constitutional protections.  (Docket Entry No. 121, p. 2.)  In short, Gonzalez contends that a reasonable person in her position (utilizing plaintiff's underlying factual allegations) would have believed that her conduct conformed to the constitutional standard in light of the information available to her and the clearly established law at that time.  *See Glenn*, 242 F.3d at 312.  Plaintiff disagrees, and argues that Gonzalez is not entitled to qualified immunity because she did not adhere to the policy provisions for participation in the strip search.

## *Analysis*

By way of background and context, Brenda Chaney, senior warden at the Jester III Unit at the time of the underlying events in this case, testified in her affidavit as follows:

> Because this lawsuit centers on strip-searches, it is important to note that the purpose of strip-searches in prison is to ascertain the presence of contraband on prisoners' bodies so as to diminish as much as possible security issues that invariably arise when contraband is introduced into prison units.  While it is routine for offenders to hide contraband in virtually any imaginable space accessible to them and within their personal living space, prisoners also frequently hide all kinds of contraband – homemade knives, razors and weapons of all kinds; narcotics; alcohol; gambling slips; tobacco; pornography; cell phones; SIM cards, money and a wide variety of other prohibited items – under their clothing, in their mouths and hidden elsewhere on their bodies.

> *   *   *   *

> Because this case involves a strip-search conducted in connection with the suspected possession of cigarettes, I would also note that cigarettes have been prohibited in TDCJ units since at least the mid-1990s.  Because the possession of money by Texas offenders is strictly prohibited, contraband cigarettes and tobacco products are an easily transported, easily concealed and easily traded cash equivalent used by inmates to buy narcotics, marijuana, alcohol, sexual

favors, to obtain extra food and personal items, to secure physical protection and to settle wagers, among many other things.  A pouch of Bugler tobacco that sells for $1.50 in the free-world economy has a value of $30 or more inside prison, and a pack of cigarettes that can be purchase for $7.00 has a value well in excess of $50.  The black-market prison trade in tobacco is often controlled by prison gangs who employ inmates with access to the areas around prisons to smuggle cigarettes into prison units, and who pay corrupt correctional officers to smuggle contraband into prison units or to look the other way when inmates smuggle in contraband.  Prison gangs also enforce the settlement of tobacco-related debts through other inmates involved in their smuggling enterprise, often with violence.

In my experience it is not uncommon for contraband, including tobacco products and cigarettes, to be found at the center of many offender disputes and fights.  I am aware of instances in which inmates have been seriously beaten over cigarettes, over tobacco products or over debts related to tobacco products or debts payable in tobacco products.  As such, one of my primary responsibilities in providing security and safety for offenders and staff is to ensure that tobacco products are found and confiscated wherever they are suspected to exist, to learn how the contraband made its way onto the prison unit and to do whatever I can to stop of the flow of illegal tobacco products into my unit.

To help curb the introduction and circulation of contraband items in prison units, including cigarettes and other tobacco products, TDCJ has adopted an administrative directive, AD-03.22, which covers offender searches.  It provides three levels of searches:  (1) a visual and pat-down search, (2) a strip search and (3) a body-cavity search.

The administrative directive provides that if a strip search must be conducted by a staff member of the opposite sex, it may only be conducted in (1) extraordinary circumstances and (2) when approved by a supervisor. All of my supervisors, male or female, are authorized to approve and to actually conduct strip searches when extraordinary circumstances exist.

The policy does not expressly define what constitutes 'extraordinary circumstances,' but based on my experience and training, the reported introduction of contraband into a prison unit – including but not limited to cigarettes and other tobacco products – can amount to extraordinary circumstances sufficient to conduct a non-routine strip search.

12

*   *   *   *

With regard to this particular strip-search, I was unaware it had occurred until I learned of the complaint in this lawsuit.  I would not normally be advised of a strip-search for contraband as described in the Plaintiff's complaint.  If a female supervisor ordered and conducted a strip-search, it would not violate TDCJ policy as described above so long as extraordinary circumstances were present.  Nor would [the] policy be violated if a female officer or supervisor were simply present in the room where a strip search was being conducted.  (Indeed, to exclude a female correctional officer or supervisor from an area in which a strip-search is being conducted could constitute a violation of agency EEO policy.)  In addition, the strip search of six or seven offenders, as alleged by Plaintiff, of approximately 110 inmates housed in the 11 or 12 dorms would not be an extraordinarily large number and strongly suggests that the investigation was focused on those offenders most likely to have been in possession of contraband.  The strip-search of offenders in the supervisor's office, which provides some measure of privacy, would also be appropriate.  As noted above, based on my 22 years of experience and training, *the possible presence of contraband would always present circumstances justifying the strip-search of offenders believed to be in possession of such contraband*.

(Docket Entry No. 121, Exhibit 1, emphasis added.)

Plaintiff complains that, on February 26, 2005, he was strip searched in the presence of Gonzalez, who "participated in a visual cavity search of Plaintiff with no extraordinary circumstances present."  (Docket Entry No. 21, p. 11.)  Specifically, plaintiff states that he, along with six other offenders, were told by Gonzalez to remove their clothing, open their mouths, lift their genitals, and expose their buttock cheeks.  According to plaintiff, Gonzalez told them that the investigation and strip searches would continue until the source of the contraband was found or the inmates "snitched" on the guilty inmates.  Plaintiff does not contend that he was subjected to subsequent strip searches by Gonzalez.

13

In her affidavit in support of the motion for summary judgment, Gonzalez testified,

in relevant part, as follows:

> I am employed as a lieutenant of correctional officers at the Jester III Unit in Richmond, Texas.  I was promoted to lieutenant in the fall of 2004.  Before I was promoted to lieutenant at the Jester III Unit, I worked as a correctional officer and later as a sergeant at a number of units in a wide variety of capacities.  In my 27 years' experience with the agency, I have provided security for countless strip-searches, and as a supervisor, I have ordered strip-searches be conducted whenever I have had reasonable cause to believe that an offender might be in possession of contraband and I have supervised the conduct of strip-searches.  Offender strip-searches are a routine, common, everyday experience for correctional staff and offenders at TDCJ units.  Every offender will be strip-searched hundreds of times during his incarceration, since such searches are required whenever there is a possibility that contraband – knives, razors, drugs, cell phones and so on – might be brought into the prison from the visitation areas, from the rec yard, from outside areas surrounding the unit, from the unit kitchen or laundry room, or from any of a number of other areas where prohibited items may be obtained or carried.
>
> *    *    *    *
>
> To the best of my recollection, I was alone in the Lieutenant Supervisor's Office filling out routine paperwork on or about February 26, 2005.  The office in which I was working is fairly large, possibly 20 by 20 feet or larger.  The office contains a couple of desks, several filing cabinets and at least two computer terminals for use by supervisory staff.  Although it usually remains open, the room has a door that may be closed for privacy if necessary.
>
> My recollection is that I was seated at one of the desks working on one of the computer terminals when Lt. Levi Peterson unexpectedly came through the door leading a group of inmates and two correctional officers.  I recall that Lt. Peterson said something to the offenders or the correctional officers about being strip-searched and that he ordered the two correctional officers to conduct strip-searches.  Since I had not ordered the strip-search searches, I simply continued my paperwork.  My recollection is that Lt. Peterson may have left the room briefly and returned.  I did not participate in any way in the inspection of the offenders' shoes, socks, clothing, or bodies.  I do not recall

14

speaking to the offenders or even observing them before Lt. Peterson stepped out of the room or afterward.  It was only after I was served with [plaintiff's] complaint that I learned the offenders apparently were being strip-searched to try to locate contraband cigarettes.  I cannot recall any interaction with [plaintiff], or with any of the offenders for that matter, either during this strip-search or at any other time.

I understand from [plaintiff's] complaint that he claims I told him and the other offenders that they could expect to be strip-searched again if they did not provide me with information about the contraband.  I never made any such comment.  Since I had not ordered the search, I had no reason to say anything at all to any of the offenders, and to the best of my recollection I did not say anything to them.  I was nothing more than a bystander to the strip-search apparently ordered by Lt. Peterson.  *But even if I had told this or any other offender that he might be strip-searched again if I were unable to find the contraband I suspected him of possessing, that would have been consistent with my duties and obligations to ensure the safety and security of offenders, staff, and the institution, as well as with TDCJ policy regarding offender searches, AD-03.22.  In fact, based on my experience and training, I would expect to be disciplined or even terminated if I did not continue to search for the suspected contraband until it was found.*

[Plaintiff] also claims that I had no probable cause to believe he possessed the information about the contraband.  This assertion is mistaken, since it assumed I ordered a search of [him] on the date in question.  In addition, even if I had ordered a strip-search of this or any other offender, I am not required to have 'probable cause' but only 'reasonable cause' to believe the offender is in possession of contraband.  *In addition, it would be fully within my authority as a supervisor to order the strip search of any offender whenever I have reasonable cause – in my opinion – to believe he was in possession of contraband.  Prison inmates are not permitted to decide whether I have probable cause or reasonable cause or any other kind of cause to conduct a search.  My duty is to the facility, the offender housed there and to the men and women who work in the facility to make sure they are as safe as possible in all of the circumstances.*

(Docket Entry No. 121, Exhibit 3, emphasis added.)  In discussing the strip-search policy,

Gonzalez further testified that,

The policy permits female officers to provide security during any strip-search, and the policy also permits female supervisors such as myself not only to order a strip-search, but to actually conduct a strip-search in extraordinary circumstances. *Based on my training and experience, the possibility that one or more inmates is in possession of contraband always amounts to extraordinary circumstances, and when in doubt I will always err on the side of caution.  Although I did not order or participate in the strip search [plaintiff] is complaining about in this lawsuit, I would have been fully within my rights and duties as a supervisor, and as a female supervisor, to order and to conduct the strip-search of any offender I reasonably believed might be in possession of contraband.*

*Id*. (emphasis added).

In his affidavit submitted in support of summary judgment, Peterson testified in

relevant part as follows:

In my almost 25 years' experience with TDCJ, I have conducted many, many strip-searches of prison inmates.  As a supervisor, I have ordered that strip-searches to be [sic] conducted pursuant to agency policy whenever I have had reasonable cause to believe that an offender might be in possession of contraband.

Although I cannot recall every detail of the events in question, my best recollection of the events in this lawsuit is as follows:

I took a group of offenders six or seven [sic] to the supervisor's office at the Jester III unit in February 2005 to undergo a strip search.  I cannot recall at this time specifically why the decision was made to strip-search these offenders, whether I ordered that the strip-search be conducted or if another supervisor ordered it or what contraband was being sought.  I do recall that I led two correctional officers and the small group of offenders to the supervisor's office, which privacy [sic] for strip-searches.  When I entered the room, I found [Officer Gonzalez] working on the computer at one of the two or three desks located in the office.  My best recollection of the layout of that office is that she would have had to have been facing the computer screen or the wall behind it and away from the offenders I'd brought into the office.

I cannot recall what, if anything, I said to [Gonzalez] about the strip-search. There was nothing unusual about [her] being in the supervisor's office and there was nothing unusual about strip-searches in that office or in [Gonzalez's] presence.   TDCJ does not prohibit female officers, who probably are the majority, from being present during strip-searches.   It also wasn't unusual for offenders to be strip-searched, since most of them are strip-searched almost every day as they return to their housing from jobs, from recreation, from school and so on.   In fact, the trusty groundskeepers I supervise are strip-searched several times a day: when they leave the trusty camp to go to work, when they go to chow in the building and when they come back to the trusty camp in the evening.   Strip searches are simply a routine part of being a Texas prison inmate, and they are very important to institutional security and safety, since the introduction of contraband – drugs, knives, tobacco, cell phones, etc. – can be very disruptive and sometimes very dangerous to prison security.

I am certain that the strip-search was conducted by the two correctional officers I brought with me to the supervisor's office, and that I never asked [Gonzalez] for any help.   I am certain that she did not participate in any way, since her assistance was not requested and not needed.   The COs – it may have been Gonzales[4] and Agumagu – would have had the inmates strip down to their shorts while they waited to be searched.   Their uniforms, shoes and socks would be checked.   Then they would be ordered to show the bottoms of their feet, open their mouths and run their hands across their heads to show there was nothing hidden in their hair.   They also would be required to open their mouths to show there was nothing hidden inside.   Then the inmates would be ordered to drop their boxers, raise their testicles and turn around and spread the cheeks of their buttocks.   The entire process usually takes well under two minutes per offender.   The total time they might be fully exposed is a few seconds at most.

If [Gonzalez] saw any of the inmates naked, it was incidental to her being in that office at that time.   I do not recall [her] speaking to any of the offenders at any time.   I am certain that she could not have ordered the strip searches, since she obviously was working in the supervisor's office before I left for the office with the [officers] and the offenders, and I would not have taken them

_____

[4]In absence of any clear evidence to the contrary, the Court assumes that plaintiff and his offender witnesses have not confused defendant female officer "Gonzalez" with non-defendant female officer "Gonzales."

to be searched unless either I had made a determination that they needed to be searched or I was ordered to do so by another supervisor.

(Docket Entry No. 121, Exhibit 4.)

Although the probative evidence submitted by the parties raises a fact issue as to whether defendant Gonzalez actually participated in plaintiff's strip and visual body cavity search, plaintiff presents no probative summary judgment evidence that the search by a female officer was performed under non-emergency or ordinary circumstances. Defendant, to the contrary, submitted probative summary judgment establishing that the factual circumstances asserted by plaintiff constitute "extraordinary circumstances."[5]  As testified by Gonzalez,

> I was nothing more than a bystander to the strip-search apparently ordered by Lt. Peterson.  But even if I had told this or any other offender that he might be strip-searched again if I were unable to find the contraband I suspected him of possessing, that would have been consistent with my duties and obligations to ensure the safety and security of offenders, staff, and the institution, as well as with TDCJ policy regarding offender searches, AD-03.22.  In fact, based on my experience and training, I would expect to be disciplined or even terminated if I did not continue to search for the suspected contraband until it was found.
>
> *             *             *             *
>
> The policy permits female officers to provide security during any strip-search, and the policy also permits female supervisors such as myself not only to order a strip-search, but to actually conduct a strip-search in extraordinary circumstances. *Based on my training and experience, the possibility that one*

---

[5]This Court does not read *Moore* to preclude "non-extraordinary circumstances" as a functional equivalent of "non-emergency" situations for purposes of constitutional claims regarding cross-gender strip-searches.

> *or more inmates is in possession of contraband always amounts to*
> *extraordinary circumstances*, and when in doubt I will always err on the side
> of caution.  Although I did not order or participate in the strip search [plaintiff]
> is complaining about in this lawsuit, I would have been fully within my rights
> and duties as a supervisor, and as a female supervisor, to order and to conduct
> the strip-search of any offender I reasonably believed might be in possession
> of contraband.

(Docket Entry No. 121, Exhibit 3, emphasis added.)

Plaintiff himself states that the basis for his strip-search was prison officials' efforts to locate the known contraband cigarettes and identify the offenders involved in the security and safety breach.  In other words, plaintiff does not controvert that the complained-of strip search was directly related to a particular prison security and safety breach.  Plaintiff's specific dispute lies with his disagreement that the contraband issue constituted extraordinary circumstances justifying his search by a female officer when male officers were available.  However, plaintiff is a prisoner; his opinions as to what does, or does not, constitute non-extraordinary or non-emergency circumstances regarding prison security and safety do not rise to the level of probative summary judgment.  Nor does plaintiff's self-proclaimed extensive base of experience as a "career prisoner" afford him any special expertise regarding this issue.  To the contrary, this Court must afford great deference to the prison officials' determinations and opinions that the factual circumstances asserted by plaintiff constituted extraordinary circumstances.  *See Elliott v. Lynn*, 38 F.3d 188, 191 (5th Cir. 1994).  Thus, a prison official's opinion that unidentified prisoners smoking contraband cigarettes in the prison dorm would constitute extraordinary circumstances, does stand as probative evidence

19

of such for this Court.  Accordingly,  plaintiff fails to meet his burden of proving that his strip search was carried out under non-emergency or non-extraordinary circumstances by a female officer.

There was nothing in the case law at the time of the incident that would have placed Gonzalez on notice that she could not conduct this particular strip search.  Plaintiff does not negate defendant's right to qualified immunity under an objective standard based on the viewpoint of a reasonable official in light of the information then available to the defendant and the law that was clearly established at the time of her alleged actions.  Plaintiff further fails to raise a genuine issue of material fact that Gonzalez's conduct was objectively unreasonable in light of clearly established law at the time of the incident.  Gonzalez is entitled to summary judgment based on the second step in the qualified immunity analysis regarding plaintiff's claim that she subjected him to a strip search on February 26, 2005. Even assuming Gonzalez did violate clearly established law, she remains entitled to qualified immunity where she acted reasonably but in a mistaken belief that her actions comported with clearly established law.  Plaintiff does not meet his burden of negating Gonzalez's entitlement of qualified immunity.

To the extent plaintiff complains under the Eighth Amendment that the strip search constituted punishment without due process, his claim lacks merit because he has no protected liberty interest in not being searched by a female officer.  The Supreme Court holds that the liberty interests protected by the due process clause are "generally limited to freedom

from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 483–84 (1985). Plaintiff presents no probative summary judgment evidence showing that the strip search itself, as related to the search for contraband cigarettes, imposed hardships atypical of ordinary prison life, and fails to show a protected liberty interest under the due process clause. *See also Waddleton*, 445 F. App'x at 808.

## Conclusion

The motion for summary judgment (Docket Entry No. 121) is GRANTED and this lawsuit is DISMISSED WITH PREJUDICE.   Any and all other pending motions are DENIED AS MOOT.

Signed at Houston, Texas on October 31, 2012.

_____
Gray H. Miller
United States District Judge